UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAMELA HARVEY

            Plaintiff,                CIVIL ACTION NO. 06-CV-11202-DT

     vs.                      DISTRICT JUDGE ROBERT H. CLELAND

COMMISSIONER OF              MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

            Defendant.
_____/


REPORT AND RECOMMENDATION

I.      RECOMMENDATION

      This Court recommends that  Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 16), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 10), and that Plaintiff's Complaint be **DISMISSED**.

II.     PROCEDURAL HISTORY

      This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

      Plaintiff Pamela D. Harvey filed an application for Disability Insurance Benefits (DIB) on July 16, 2001.  (Tr. 53-55, 63).  Her DIB insured status date expired on June 30, 2002.  (Tr. 26).  Plaintiff alleged she had been disabled since February 25, 1997 due to back and left leg pain.  *Id.*  Plaintiff's claims were initially denied in September 2001.  (Tr. 41-47).  Plaintiff sought a review hearing before an Administrative Law Judge (ALJ).  (Tr. 48-49).  A hearing took place before ALJ Regina Sobrino on February 10, 2003.  (Tr. 497-549).  Plaintiff was represented by an attorney at the hearing.  (Tr. 39-40, 497).  The ALJ denied Plaintiff's claims in an opinion issued on February 27, 2003.  (Tr. 22-31).  The

Appeals Council denied review of the ALJ's decision on January 31, 2006 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 7-21). Plaintiff appealed the denial of her claim to this Court and both parties have filed motions for summary judgment.

### III.   **MEDICAL HISTORY**

Plaintiff fell and injured her back at work in 1997. (Tr. 115, 228). Thereafter, she received medical treatment at Genesys Regional Medical Center for complaints of lower back pain. In March, April and May 1997 Plaintiff also underwent physical therapy, which proved helpful. (Tr. 115-17, 291-99).

Medical reports from June 1997 by Dr. Day-Krusniak indicate that Plaintiff was being weaned off of her narcotic medication. An examination showed no spinal tenderness and lower left leg tenderness on deep palpation. A straight leg raising test was positive at 75 degrees but Plaintiff's reflexes were 2+ bilaterally. (Tr. 287). Plaintiff told her physical therapist that she was no longer able to work at her current job or take care of her housework or three children due to her back pain. (Tr. 118). She rated her pain as a 3 on a 10-point scale. Plaintiff was lifting and bending with discretion and was able to sit for appropriate amounts of time. *Id.* She was discharged from physical therapy with instructions on how to perform home exercises. *Id.*

Dr. Day-Krusniak reported that Plaintiff returned for treatment in July 1997 for complaints of recurring back pain with paresthesia on the left buttock and left lateral thigh. (Tr. 285). Plaintiff stated that her severe pain had caused nausea and vomiting. (Tr. 284). Dr. Day-Krusniak scheduled Plaintiff for an MRI of her lower back and re-filled Plaintiff's prescriptions. *Id.* A subsequent MRI showed Grade I-II spondylolisthesis of L5 on the sacral base which was markedly narrowed at the exit foramina. (Tr. 280).

In August 1997 Plaintiff returned to see Dr. Day-Krusniak for her continuing back pain. She told the doctor that her pain had persisted despite the physical therapy and prior medication and that she wanted a prescription for Tylenol #4. An examination showed that Plaintiff had no spinal tenderness but some tenderness to deep palpation over the left iliac crest. A straight leg raising test was positive on the left at 60 degrees, reflexes were 2+ bilaterally, sensation was intact, and she had motor strength bilaterally. (Tr. 281-82). Dr. Day-Krusniak believed that Plaintiff was addicted to narcotics and refused to prescribe any further narcotic medication until Plaintiff was seen by a neurosurgeon. *Id.*

The records from August and September 1997 show that Plaintiff made further requests for narcotic medication to Dr. Day-Krusniak, which he denied. However, Plaintiff was able to get prescriptions for small amounts of narcotic medication from other doctors. (Tr. 268-79). Examination findings during this time period revealed that Plaintiff had positive straight leg raising tests on the left at 50 to 60 degrees with 2+ reflexes bilaterally, intact sensation, and 5/5 bilateral motor strength. *Id.* X-rays taken of Plaintiff's lumbar spine on September 17, 1997 showed spondylolysis of L5 with Grade II spondylolisthesis of L5 over S1. (Tr. 122-23). Examination findings were similar to those from August.

Plaintiff was also undergoing physical therapy during this time period. (Tr. 120-21, 124, 386-401). It was noted that Plaintiff had an alternate gait pattern, good balance, and functional coordination. (Tr. 120). Her strength was 4/5 and she had an active range of motion in her dorsal and lumbar spine within functional limits. *Id.*

Plaintiff's treatment with Dr. Day-Krusniak continued in October and November 1997. (Tr. 262-67). In October 1997 Plaintiff reported that she was doing better and that physical therapy helped her somewhat. She was also taking Xanax to help her relax during physical therapy. (Tr. 266). Plaintiff stated that she was trying to use less pain medication. *Id.* Dr. Day-Krusniak reported on November

-3-

25, 1997 that Plaintiff's examination findings had remained unchanged except that a straight leg raising test was negative on both sides. (Tr. 262). Plaintiff stated that she had some success with physical therapy but that on some days she felt worse after therapy. *Id.* Plaintiff was discharged from physical therapy on December 2, 1997. (Tr. 386).

On December 8, 1997 Plaintiff was examined by Dr. John Kohn. Dr. Kohn's examination revealed that Plaintiff had a normal gait and she could heel and toe walk without difficulty. (Tr. 128). Plaintiff's lumbar spine range of motion was limited to 30 degrees of forward flexion before pain resulted but she had a full range of motion upon side bending and extension. A straight leg raising test was positive on the left side. *Id.* Dr. Kohn recommended a series of epidural injections. (Tr. 129).

Plaintiff subsequently received epidural injections in December 1997 and January 1998 but Plaintiff reported that the injections did not provide significant relief. (Tr. 129, 165). Plaintiff thereafter underwent an anterior lumbar interbody fusion with an iliac bone graft on March 3, 1998, which was performed by Dr. Barry Landau. (Tr. 133). She was released from the hospital in stable condition with instructions not to lift more than 10 pounds, engage in prolonged sitting or bending, or drive. Plaintiff was to walk as tolerated. (Tr. 134). X-rays taken after the surgery showed stable post-operative changes at L5-S1 with mild Grade I spondylolisthesis. Vertebral height was normal. (Tr. 140).

Plaintiff's follow-up treatment records from 1998 reflect that Plaintiff continued to report residual pain associated with her back and legs. (Tr. 145, 235-59). Records from May, June, and July 1998 revealed that Plaintiff had negative straight leg raising tests and no motor or neurological deficits. (Tr. 246-50). In August 1998 Plaintiff had a normal gait, straight leg raising tests were negative, and she had no neurosensory deficits. (Tr. 145-46, 245). However, she had a limited range of lumbar motion upon flexion and left sacroiliac joint tenderness. *Id.* Similar examination findings were made in September and October 1998. (Tr. 238, 243).

During this period, Plaintiff underwent another series of epidural injections to treat her pain, which provided moderate relief. (Tr. 146, 154-55, 160-64). She was attending physical therapy again. (Tr. 334-84). Plaintiff was also examined by Dr. Wilbur Boike, a neurologist, who noted that she had normal muscle strength, coordination, tone, and bulk. Plaintiff's sensations were intact and her reflexes were 2+ and symmetrical. (Tr. 358, 373, 384). Plaintiff told Dr. Boike that her lower back pain was had been reduced since her surgery. (Tr. 384). In December 1998 Plaintiff told Dr. Boike that she was feeling 100% better and that she was off of her narcotic medication. (Tr. 351). Dr. Boike recommended that Plaintiff not lift more than 30 pounds and avoid repetitive bending. *Id.*

In January 1999 an x-ray of Plaintiff's lumbar spine showed continuing spondylolisthesis at L5-S1. (Tr. 177). A CT scan revealed generally normal disc heights although the spondylolisthesis had caused slight narrowing of the L5-S1 nerve canal. (Tr. 179). Examination findings from January showed no neurological deficits, a negative straight leg raising test, intact sensation, and full motor strength in both legs. (Tr. 173-74). Dr. Boike examined Plaintiff in February 1999 and noted that she had normal muscle strength and that straight leg raising tests were negative. (Tr. 345). Dr. Boike recommended that Plaintiff perform her home stretching exercises. *Id.*

In May 1999 Dr. Landau reviewed Plaintiff's CT scan results and concluded that although the bone graft dowels from Plaintiff's prior surgery were well-positioned, fusion had not taken place. Dr. Landau noted that Plaintiff complained of radiating lower back pain but that she was not taking narcotic medication on a daily basis. (Tr. 183). Examination findings showed 5/5 bilateral strength in Plaintiff's lower extremities, 2+ reflexes, and some tenderness to palpation. *Id.* Plaintiff subsequently underwent total laminectomy with bilateral facetectomy and foraminotomy at L5 and a posterolateral spinal fusion at L5-S1 on May 25, 1999. Dr. Landau also inserted pedicle screws and a bone growth stimulator to assist with fusion. *Id.* Plaintiff was released from the hospital in stable condition with instructions not

-5-

to lift more than 10 pounds, engage in prolonged sitting or bending, or drive. Plaintiff was to walk as tolerated. (Tr. 184). Follow-up x-rays of Plaintiff's lumbar spine were taken between May 1999 and February 2000 which showed continuing spondylolisthesis with a stable lumbar spine. (Tr. 185-86, 188, 191, 193, 200). Plaintiff was again discharged from physical therapy on December 3, 1999.

Plaintiff was seen by an occupational therapist in March 2000 for a physical capacity evaluation. (Tr. 324-414). Plaintiff told the therapist that she was restricted to no lifting greater than 20 pounds and no repetitive bending and that she required a sit/stand option. (Tr. 324). The therapist noted that Plaintiff did not consistently appear motivated to work to her full capabilities as evidenced by her focus on her subjective pain. (Tr. 326). The therapist also commented that Plaintiff's functional limitations were not always consistent with physical examination findings. *Id.* The therapist further reported that Plaintiff demonstrated a good tolerance to static positions, tolerance to positional activities such as crawling, kneeling, and crouching, and good hand strength and coordination. (Tr. 327). However, Plaintiff had decreased squatting abilities and tolerance to stair and ladder climbing. *Id.* The therapist noted that Plaintiff could lift 20 to 30 pounds, push 35 to 80 pounds, stand frequently, and sit/walk continuously in a 40-hour workweek. (Tr. 331). The therapist summarized that Plaintiff did not have the functional ability to perform her work as a hospital cook and that it was unlikely any significant improvement in Plaintiff's capabilities would be achieved with further therapy. *Id.* The therapist also believed that Plaintiff tended to self-limit herself functionally.

Dr. Landau reviewed the occupational therapist's findings and agreed that Plaintiff had reached her maximum medical improvement. He also noted that the functional restrictions described by the occupational therapist should be kept in mind for future vocational retraining purposes. (Tr. 414). Dr. Landau did not believe that Plaintiff had developed a tolerance to narcotic medication and therefore he thought it reasonable to continue her on long-term narcotic medication. (Tr. 415).

In April 2000 Dr. Day-Krusniak noted that Plaintiff had intact gait, sensation, and motor skills. Plaintiff's reflexes were 2+/4 and she had limited range of motion in her back upon flexion. The doctor believed that Plaintiff was addicted to narcotic medication. (Tr. 210-15).

A CT scan from June 2000 showed that Plaintiff's lumbar spine fusion was stable, the pedicle screws were in good position, and no significant abnormality was present. (Tr. 202). Examination findings from June 2000 showed negative bilateral straight leg raising tests. (Tr. 208). Plaintiff also began treatment with Dr. Stuart Weiner, an oncologist, for pain management. (Tr. 473-74).

Plaintiff reported in July 2000 that her back pain had increased since returning to work. (Tr. 207). Straight leg raising tests remained negative. (Tr. 206).

In August 2000 Dr. Landau removed the bone growth stimulator from Plaintiff's back due to her complaints of persistent pain at the stimulator site. (Tr. 300-05, 472). In October 2000 Dr. Weiner noted that Plaintiff's pain was "remarkably well-controlled on her present regime." (Tr. 469).

Plaintiff reported in February 2001 that she had stopped working at her sit-down job due to severe pain. (Tr. 409). Examination findings showed both a positive and a negative straight leg raising test, normal reflexes, and normal motor strength. (Tr. 308, 409). In March 2001 Plaintiff's examination findings were unchanged except that diffuse weakness was noted in the left leg. (Tr. 405, 464). Dr. Landau believed that Plaintiff's pain might be caused by the implanted hardware but advised against the hardware's removal. (Tr. 405-06).

Dr. Landau noted in May 2001 that Plaintiff had made some objective gains with physical therapy but there had been no significant improvement in Plaintiff's subjective complaints. (Tr. 403). He opined that Plaintiff was not a good candidate for further surgery because diagnostic imaging showed normal post-operative appearance with solid fusion at L5-S1. Dr. Landau indicated that Plaintiff's treatment options included continuing with her current medication regime and applying for

long-term disability, for which he believed Plaintiff should qualify, or pursuing chronic pain management options such as an implanted spinal cord stimulator or drug pump. (Tr. 461-62). Dr. Landau further noted that Plaintiff was unable to perform heavy lifting or bending and that she had difficulty with prolonged sitting. (Tr. 461). During this time period, Dr. Weiner noted that Plaintiff's pain was "fairly well controlled" with Duragesic, Soma, and Oxy-IR. (Tr. 463).

Plaintiff was examined by Dr. Todd Lininger in August 2001 at Dr. Landau's request. (Tr. 436-39). Plaintiff told Dr. Lininger that the regime of pain medication she was taking was helpful and that she felt better than she had in quite a while. (Tr. 436-37). Upon examination, Plaintiff had a limited lumbar range of motion, negative bilateral straight leg raising tests, normal hip range of motion, and a slight decrease in pinprick sensation at left L5 but which was otherwise intact. (Tr. 438). Dr. Lininger believed that Plaintiff was a good candidate for intrathecal therapy and he discussed this therapy with Plaintiff, including its high success rate for pain control. Dr. Lininger told Plaintiff that to participate in a trial-run of this therapy, she would have to discontinue using her narcotic medication for at least one week. Plaintiff responded that she was not interested in this therapy. (Tr. 438-39).

A state agency medical expert also reviewed Plaintiff's medical records in August 2001. The expert concluded that Plaintiff could perform a range of light work with the following limitations: (1) sitting for about 6 hours in an 8-hour workday; (2) standing or walking for 4 hours in an 8-hour workday; (3) no climbing ladders, scaffolds, or ropes; and (4) occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 428-32).

Plaintiff was examined by Dr. Jacob Mathis, a neurosurgeon, in November 2001. Dr. Mathis informed Plaintiff that he did not believe she was a candidate for further neurosurgical procedures and that he was concerned about the amount of Percocet that she was taking daily. He also recommended further vocational rehabilitation training although he did not believe that such attempts would be

successful. (Tr. 456). Examination findings showed some tenderness but no muscle spasms. Plaintiff's lower back movements were accomplished in a deliberate manner, no motor weakness or muscle atrophy was detected, and straight leg raising tests were negative. *Id.* Dr. Mathis also wrote a note on prescription paper that Plaintiff was "temporarily totally disabled." (Tr. 459).

Plaintiff was also seen for the first time by Dr. Roger Black, an oncologist and partner to Dr. Weiner, in November 2001. Dr. Black stated that Plaintiff's pain was "fairly well controlled" and that she was "getting good results." (Tr. 454). Plaintiff was next seen by Dr. Black in February 2002 at which time he stated that he believed Plaintiff should continue on permanent disability due to her chronic back pain and because no further surgical options were available to her. (Tr. 452, 458). He further noted that there had been no changes to Plaintiff's condition and that her pain remained well-controlled with medication. (Tr. 452). Dr. Black noted in May 2002 that Plaintiff was "relatively stable" and that her pain was "fairly well controlled" with medication, including Duragesic patches every 72 hours, Soma four times a day, and Percocet as needed. (Tr. 450). Dr. Black also stated that Plaintiff was still having problems with fatigue, which might have been related to her pain medication. *Id.*

In August 2002 Dr. Weiner treated Plaintiff and noted that her pain was being adequately controlled. (Tr. 448). Plaintiff reported to Dr. Black in September 2002 that she was having increased pain. Examination findings indicate that Plaintiff had some limited range of motion in her left leg and lower back with adequate muscle strength except on the left. Plaintiff was neurologically intact. (Tr. 445). Dr. Black thereafter noted that Plaintiff was presently unable to perform any job. (Tr. 444).

In October 2002 Dr. Weiner wrote a letter stating that Plaintiff had continuous and unrelenting pain associated with muscle and nerve damage. He also indicated that Plaintiff was on several medications which caused side effects such as an inability to focus or remain on task and a need to rest up to 6-8 hours a day. Dr. Weiner also commented that Plaintiff's pain prevented her from sitting or

-9-

standing for more than one hour before needing to lie down.  (Tr. 443).  Dr. Weiner again opined that Plaintiff should be be placed on permanent disability and was unable to perform any job.  *Id.* Thereafter, in January 2003, Dr. Weiner wrote another letter indicating that his treatment of Plaintiff was limited to pain management and that "in all likelihood [she] would not be able to work due to her underlying chronic pain."  (Tr. 440).  Dr. Weiner further stated that "if there is a question of the patient's capabilities regarding her work status this will need to be addressed by her original neurosurgeon or attending physician.  *Id.*

## IV.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff was 38 years old when she testified before the ALJ and she had a 10th grade education.  (Tr. 500).  Plaintiff testified that she was employed as a cook in a hospital when she injured her back.  Plaintiff returned to full-time work at the hospital two weeks after her accident although her work was with certain restrictions.  Plaintiff testified that she stopped working again in August 1997.  (Tr. 500-02).  Plaintiff also stated that she returned to work in June 2000 as a records clerk.  However, she stopped working on January 26, 2001 because the job involved too much sitting, heaving lifting, repetitive bending, back twisting, and long hours.  (Tr. 503, 528).

Plaintiff estimated that she could: (1) sit for 45 minutes; (2) stand for 30-45 minutes; (3) walk ½ a block; and (4) lift up to 5 pounds.  (Tr. 503-05).  She also testified that she had problems using her hands to hold onto a pen or pencil or to pick up coins.  (Tr. 505).  Plaintiff also claimed to have difficulty stretching out her arms, bending over, climbing more than 3 stairs, pushing/pulling, and crouching.  (Tr. 505-06, 523).

Plaintiff then commented about the medications that she took for her impairments.  (Tr. 507-08, 510).  She testified that her medication made her tired and so she needed to nap at least 3

times a day for a couple of hours.  (Tr. 508-09).  Plaintiff also stated that her medication caused loss

of concentration.  (Tr. 509).  She could not pinpoint which medication caused these effects.  (Tr.

520-21).  Plaintiff told the ALJ that her doctor knew of these side effects but that her doctor had not

changed them, stating there was nothing that could be done.  *Id.*

Plaintiff also indicated that she only slept for 3 to 4 hours a night due to pain.  When she

awoke, she would sit in her recliner.  (Tr. 520).  Plaintiff testified that she would alternate her

position during the day about 4 times.  (Tr. 522).  Generally, she alternated between the sitting/lying

down or standing/lying down positions.  (Tr. 522-23).  Plaintiff further testified that she had

collapsed about once every month due to leg numbness.  (Tr. 521, 525).

When asked about her daily activities, Plaintiff testified that her daughters did the laundry

and most of her errands.  She helped them with cooking and she used to grocery shop.  Plaintiff

stated that she was able to drive but she had not driven for a long time.  (Tr. 511-12).  Plaintiff had

two school-age children and she attended their parent-teacher conferences.  (Tr. 512).  On a typical

day, Plaintiff would pick up the house, watch television, read, cook, visit with friends at her house,

and crochet.  (Tr. 517-18).  Plaintiff testified that when she increased her activity level, her pain

would also increase.  (Tr. 519).  To deal with the pain, Plaintiff found it helpful to lie down for a

couple of hours with a pillow between her legs or knees.

### B.    Vocational Expert's Testimony

Pauline McEachin, a certified rehabilitation counselor, testified as a vocational expert at

the hearing.  (Tr. 526-46).  Ms. McEachin testified that Plaintiff's prior work as a records clerk as

performed by Plaintiff would be classified as medium work.  However, she noted that the position

of records clerk is generally classified in the Dictionary of Occupational Titles ("DOT") as sedentary

work.  (Tr. 528).

-11-

The ALJ asked Ms. McEachin about whether the job of records clerk as it was described in the DOT could be performed by a hypothetical individual of Plaintiff's age, education, and work experience who needed an option to sit/stand at-will and who was limited to: (1) frequent lifting, carrying, pushing, or pulling of 10 pounds; (2) occasional lifting, carrying, pushing, or pulling of 15 pounds from the waist-level to overhead and 20 pounds from the floor to the waist-level; (3) no repetitive lifting or bending; (4) standing/walking for 4 to 8 hours in an 8-hour workday; (5) sitting for at least 6 hours in an 8-hour workday; (6) occasional climbing ramps or stairs; (7) no climbing ladders, ropes, or scaffolds; (8) rarely stooping or squatting; (9) no working overhead; (10) no crawling or kneeling; and (11) no commercial driving or exposure to hazards.

Ms. McEachin testified that such an individual could perform the work of records clerk as described in the DOT and as performed in the general economy. (Tr. 532-33). She also testified that such an individual could perform other unskilled, sedentary work and that the jobs fitting this description in the regional or national economy included: 2,000 video surveillance jobs, 1,200 information clerk jobs, 1,100 ID clerk jobs, and 2,200 visual inspector positions. *Id.*

## IV.    LAW AND ANALYSIS

### A.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts

-12-

in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

## B.   FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1)   he was not presently engaged in substantial gainful employment; and

(2)   he suffered from a severe impairment; and

(3)   the impairment met or was medically equal to a "listed impairment;" or

(4)   he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational

expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

C.   **ARGUMENTS**

    1.   **Whether Plaintiff's Impairment Met or Equaled a Listed Impairment**

Plaintiff asserts that the ALJ erred at Step Three in finding that Plaintiff did not suffer from an impairment or combination of impairments that met or equaled the criteria of Listing 1.04A. In order to establish disability under the Listings, each requirement of the applicable Listing must be met. *See* 20 C.F.R. § 404.1525(d)("We will not consider you impairment to be one listed in appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment"); *see also Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885 (1990)("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria"). If any one requirement is not satisfied, the ALJ must move beyond the Listings and determine whether the claimant can perform either his past work or other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v); *see also Foster, supra*, 279 F.3d at 354. The claimant bears the burden of demonstrating that her impairment meets or equals a listed impairment. *Id.*

Plaintiff asserts that her back condition meets the requirements of § 1.04(A) of the Listings, which states the following:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposis, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthiritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.    Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

-14-

> reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine).

The ALJ concluded that Plaintiff had "severe" degenerative disc disease of the lumbar spine -- one of the impairments identified in the Listing.  Defendant does not dispute that Plaintiff's lower back impairment was also accompanied by nerve root compression and limitations in her spinal range of motion.

However, the parties point to conflicting evidence in the record regarding whether Plaintiff met the remaining criteria of Listing 1.04A.  It is the function of the ALJ, and not this Court, to resolve these conflicts.  *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)("Our role is not to resolve conflicting evidence in the record or to examine the credibility of the claimant's testimony. Instead, we focus on whether substantial evidence supports the Commissioner's decision...").   In doing so, the ALJ determined that Plaintiff did not meet the criteria for Listing 1.04A.  The ALJ's decision was supported by substantial evidence.

From June to December 1997 Plaintiff had positive straight leg raising tests; the only exception was the month of November.  However, during this same time period, Plaintiff's reflexes and sensations were intact.  She had full motor strength, although a slight decrease was noted in August 1997.  (Tr. 120, 122-23, 129, 262, 281-82, 284, 287, 426).  Following her surgery in 1998, Plaintiff had negative straight leg raising tests, full motor strength, and intact reflexes and sensations.  (Tr. 145-46, 238, 243, 245-50, 358, 373, 384).  In 1999 and 2000 Plaintiff continued to have negative straight leg raising tests and she had full motor strength and intact sensations and reflexes with only some diminished reflexes noted in April 2000.  (Tr. 173-74, 183, 206, 208, 210-15, 345).  Plaintiff had both positive and negative straight leg raising tests in 2001 with diffuse weakness in the left leg noted on some occasions but she generally had  intact reflexes and sensations.  (Tr. 308, 314, 320, 405, 409, 438, 456, 464).  Only two of the four medical reports from 2002 contain any relevant clinical findings.  The report from May 2002 states

nothing other than that Plaintiff had an adequate range of motion in all extremities. The report from September 2002, which was after Plaintiff's disability insured status expired, states that Plaintiff had "some" limitations in range of motion, adequate muscle strength except on the left lower extremity, and loss of "some" sensation through the left lower extremity although Plaintiff was neurologically okay. There is no mention of a straight leg raising test. (Tr. 445). There are no clinical findings pertaining to 2003. Based upon the evidence as a whole, the ALJ's finding was well within her "zone of choice" and the Court will not disturb it. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Plaintiff also asserts that the ALJ's finding that Plaintiff's impairment was not equal in severity to Listing 1.04A was not supported by substantial evidence. To show that her impairment is equivalent to a listed impairment, a claimant must present medical findings equal in severity and duration to all the criteria for the most similar listed impairment. 20 C.F.R. § 404.1526(a), *Sullivan*, 110 S. Ct. at 891. Plaintiff does not articulate any rationale or point to any other medical evidence to support her argument. Nevertheless, the record as a whole demonstrates that a majority of Plaintiff's clinical findings revealed no functional limitations associated with her spinal impairment. The clinical findings also demonstrate that Plaintiff's impairment generally did not affect her ability to ambulate and she did not need an assistive device. Moreover, the functional capacity evaluations in the record noted that Plaintiff was capable of performing various ranges of light work. Such findings are not indicative of an impairment so severe that it is disabling.

### 2.   Whether the ALJ's RFC Finding Is Supported By Substantial Evidence

The ALJ found that Plaintiff had the RFC to perform: (1) frequent lifting, carrying, pushing, or pulling of 10 pounds; (2) occasional lifting, carrying, pushing, or pulling of 15 pounds from the waist-level to overhead and 20 pounds from the floor to the waist-level; (3) no repetitive lifting or bending; (4) standing/walking for 4 to 8 hours in an 8-hour workday; (5) sitting for at least 6 hours in an 8-hour

workday; (6) occasional climbing ramps or stairs; (7) no climbing ladders, ropes, or scaffolds; (8) rarely stooping or squatting; (9) no working overhead; (10) no crawling or kneeling; and (11) no commercial driving or exposure to hazards.  Plaintiff also required the option to sit/stand at will.

Plaintiff asserts that this RFC finding is not supported by substantial evidence.  Specifically, Plaintiff alleges that the ALJ erred in finding her less than totally credible in regard to her testimony that she had:  (1) fatigue caused by lack of sleep due to pain and the side effects of medication which resulted in a need to frequently nap throughout the day; (2) pain which necessitated frequent positional changes between sitting or standing and lying down; and (3) an inability to concentrate or focus on task due to her medications.

Plaintiff contends that her testimony was supported by the opinions of Dr. Black and Dr. Weiner and should therefore not have been discounted.  Specifically, Plaintiff points to the statements by both doctors that Plaintiff should be on permanent disability and was unable to perform any job.  She also notes that Dr. Black had stated in one report that Plaintiff had fatigue possibly related to her medication.  Plaintiff further directs the Court to Dr. Weiner's statement that Plaintiff's medication caused side effects such as an inability to focus or remain on task and a need to rest for 6-8 hours during the day and that Plaintiff's pain would not allow her to sit or stand for more than 1 hour.

As the Sixth Circuit stated in *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997), "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimant's only once."  Indeed, 20 C.F.R. § 404.1527(d)(2) provides that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  However, an ALJ is not bound by a treating physician's opinion if that opinion is not supported by sufficient clinical findings or is

-17-

otherwise inconsistent with other substantial evidence in the record.  *See Walters*, 127 F.3d at 530.  The

ALJ need not, however,  "give any special significance to the source of an opinion on issues reserved

to the Commissioner . . . ."  20 C.F.R. § 404.1527(e)(3).  One such issue is "the determination or

decision about whether you meet the statutory definition of disability."  20 C.F.R. § 404.1527(e)(1).

No error occurred as a result of the ALJ's lack of discussion or failure to adopt the opinions of

Dr. Black and Dr. Weiner that Plaintiff was permanently disabled or unable to work.  Such opinions did

not concern the nature or severity of Plaintiff's impairments.  Rather, it was an opinion on an issue

reserved to the Commissioner and was entitled to no "special significance."

The ALJ also properly rejected Dr. Weiner's statements that did concern the nature and severity

of Plaintiff's impairments.  Dr. Weiner's treatment relationship with Plaintiff was limited.  Although

Plaintiff alleges an onset of disability in 1997, she did not begin treatment with Dr. Weiner until June

2000.[1]  The record also indicates that between June 2000 and August 2002 Dr. Weiner only examined

Plaintiff on seven occasions.  The nature of Dr. Weiner's treatment relationship with Plaintiff was solely

for pain management.  As Dr. Weiner stated, he had not even evaluated the cause of Plaintiff's pain.

These factors diminished the likelihood that Dr. Weiner could provide "detailed, longitudinal picture"

of Plaintiff's impairments.  20 C.F.R. § 404.1527(d)(2).

The supportability of Dr. Weiner's statements are also brought into question by his own medical

records.  Dr. Weiner's letter states that Plaintiff is on several medications which may cause the various

side effects.  Dr. Weiner was not clear as to whether he believed that Plaintiff was experiencing such

effects or whether he simply meant that the medications which Plaintiff took are generally known to

cause such effects.  There is little evidence contained within Dr. Weiner's examination reports to

---

[1]        The records from Plaintiff's treating physicians prior to June 2000 do not reflect that
Plaintiff was suffering from any debilitating side-effects from her medication.

-18-

support the former interpretation. Specifically, there is no mention in Dr. Weiner's reports that Plaintiff reported an inability to focus or to remain on task. There is also no indication that Dr. Weiner observed Plaintiff experiencing these side effects or that he conducted any examinations to test for such deficiencies. Fatigue is not mentioned in the record until May 2002, at which time Dr. Black stated that such fatigue "might" be caused by Plaintiff's medication. However, Dr. Weiner's records never establish that Plaintiff's medication caused fatigue so severe that Plaintiff was required to nap for 6 to 8 hours a day. Furthermore, Dr. Weiner noted himself that he was not a good source for addressing Plaintiff's functional limitations, which is evident from the minimal clinical findings made by Dr. Weiner that would support such limitations.[2]

Moreover, the reports of Dr. Weiner and Dr. Black consistently state that Plaintiff had no new complaints aside from fluctuations in pain. The records also show that Dr. Weiner and Dr. Black would alter Plaintiff's medication as needed to accommodate Plaintiff's complaints. However, there is no indication that the doctors attempted to change Plaintiff's medication in response to these alleged side effects. There are also no notations in the doctors' files that Plaintiff was cautioned about the side effects at issue or how her medications might affect her functional abilities. And, although Dr. Weiner and Dr. Black had written notes that Plaintiff was permanently disabled and unable to work any job, neither of them indicated that this was due to the side effects of medication. Dr. Weiner's statement that Plaintiff was suffering from severe side effects is also inconsistent with the repeated statements in his own reports and those of Dr. Black that Plaintiff's pain was well-controlled on her medicinal regime and that Plaintiff was doing well and was fairly stable.

---

The record shows that Plaintiff reported some bouts of insomnia in 1997 and Plaintiff's doctors responded by altering her medication. (Tr. 274). While the records of Dr. Black and Dr. Weiner note that Plaintiff was taking Ambien for sleep at night, there is no indication that this medication was ineffective until September 2002. (Tr. 445-46). At that time, Plaintiff's medication was again altered. No complaints of insomnia followed. (Tr. 441).

Putting aside the opinions of Dr. Weiner and Dr. Black, the ALJ also properly assessed Plaintiff's credibility as to her alleged pain and related symptoms. Because pain is a largely subjective matter, an ALJ may properly consider the claimant's credibility in evaluating her complaints of disabling pain. *See Walters*, 127 F.3d at 531. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* Furthermore, an ALJ's findings based on the credibility of the claimant are to be accorded great weight and deference. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *See id.*

Plaintiff testified that she could only sit/stand for up to 45 minutes, walk ½ a block, and lift up to 5 pounds. However, the opinion evidence from physical therapists, Dr. Landau, and a medical expert stated that Plaintiff had the functional capacity to perform work greater than that to which Plaintiff testified. The clinical findings also showed that Plaintiff generally had good motor strength, intact sensations, and a normal gait. Furthermore, the veracity of Plaintiff's subjective complaints was questioned in 2000 when it was noted that Plaintiff tended to self-limit herself functionally and that her subjective complaints were not always consistent with the clinical findings.[3] Based upon the evidence as a whole, the ALJ's credibility finding is supported by substantial evidence.

**3.     Whether the ALJ Properly Determined that Plaintiff's Past Relevant Work**

The ALJ determined at Step 4 that Plaintiff could return to her past, relevant work as a

---

[3]     Plaintiff further stated that she had problems using her hands to hold onto a pen or to pick up coins yet she testified that she could crochet. There is also no objective medical evidence that supports this limitation. Plaintiff also told the ALJ that she could not concentrate due to her medication. However, Plaintiff was able to drive, read, and cook. There is also no mention in Plaintiff's report of daily activities that she had limitations due to loss of concentration.

-20-

records clerk as that work was ordinarily performed in the national economy.  Plaintiff contends that

her past work as a records clerk did not constitute past relevant work as it was part of an unsuccessful

work attempt.[4]

The ALJ determined that Plaintiff's work as a records clerk was not an unsuccessful work

attempt because Plaintiff performed that work at the substantial gainful activity ("SGA") level for more

than six months.  (Tr. 26).  A job that an applicant held for more than six months at the SGA level

cannot be deemed an "unsuccessful work attempt".  20 C.F.R. § 404.1574(c)(5); *King v. Chater*, 72 F.3d

85, 87 (8th Cir. 1995).  The SGA level, so far as concerns this case, was $700 a month in 2000 and $740

a month in 2001.  20 C.F.R. § 404.1574(b)(2)(i), (ii)(B); *Reeder v. Apfel*, 214 F.3d 984, 989 (8th Cir. 2000);

*Byington v. Chater*, 76 F.3d 246, 249 (9th Cir. 1996).

The evidence shows that Plaintiff worked from June 28, 2000 through January 26, 2001, which

is a period of almost 7 months.  However, Plaintiff asserts that she missed 2 months during this work

period due to her impairments, directing the Court's attention to her Work Activity Report.  (Tr. 80-85).

Plaintiff therefore argues that she actually engaged in less than 6 months of work activity and that this

work activity constituted an unsuccessful work attempt under 20 C.F.R. § 404.1574(c)(4) (setting forth

criteria for evaluating whether work lasting 3 to 6 months was unsuccessful work attempt).

Social Security Ruling ("SSR") 84-2, 1984 WL 49799 *2,  provides that "[a]fter the first

significant break in continuity of a person's work, the ensuing period of work is regarded as continuous

---

[4]         Plaintiff also briefly notes that the ALJ's decision was not supported by substantial
evidence because VE testified that given the ALJ's RFC, Plaintiff could not perform her work as a
records clerk as previously performed.  However, the inquiry at step four is whether Plaintiff can
return to her past work either as she performed it or as it is generally performed in the national
economy.  *See* Social Security Ruling ("SSR") 82-61; *Bowen v. Yuckert*, 482 U.S. 137 (1987); *Studaway v.
Sec'y of Health & Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987).  The VE testified that Plaintiff
could return to her past work as it is generally performed. Therefore, Plaintiff's argument in this
regard lacks merit.

-21-

until another such change occurs - - that is, until the impairment . . . causes the work to be "discontinued" . . . or to be reduced to the non-SGA level." SSR 84-25 defines the term "discontinued" to mean, in part, that the person was either out of work for at least 30 consecutive days. *Id.*

Plaintiff wrote in her Work Activity Report that she had missed two months of work during the time period at issue. (Tr. 85). However, Plaintiff did not indicate that she missed this work due to her impairment or that these alleged two months occurred consecutively or cumulatively. The Report itself only notes a gap occurring in September 2000 without specific dates. (Tr. 82). Nevertheless, information provided solely by a claimant is insufficient to prove why a work effort was discontinued or was reduced to non-SGA levels. SSR 84-25, 1984 WL 49799 *3. The evidence indicates that Plaintiff was off of work for about 17 days in September 2000 due to the removal of a bone growth stimulator. (Tr. 300, 470). There is no objective evidence corroborating Plaintiff's claim of additional absences from work due to her impairments and it was her burden to do so at step one.[5]

Furthermore, Plaintiff stated that she earned over $1000 during the months in which she worked in 2000. (Tr. 57, 82). And, although Plaintiff stated she received no income in September 2000, this statement is not corroborated by the objective evidence for the reasons noted above. According to Plaintiff's earning records, she earned an average of over $900 per month in 2000 and $1,078 in 2001. (Tr. 57). Because Plaintiff stated that she only worked in January 2001, the evidence shows that she also earned over $1000 in January 2001.[6] These earnings constitute SGA.[7] Based upon these facts, the ALJ's

---

[5]    To the extent Plaintiff alleges that the ALJ should have found her work as a records clerk to be an unsuccessful work attempt under 20 C.F.R. § 404.1574(c)(4), the lack of such impartial evidence would have similarly been detrimental to Plaintiff's claim. In any event, it would not be prudent for this Court to resolve this issue in the first instance.

[6]    Plaintiff reported that she earned $605 in January 2001 and $192 in February 2001. As noted, Plaintiff only worked in January 2001, which means that the money she claims she earned in February 2001 must have accounted for work performed in January. Consequently, even by Plaintiff's report, she earned $797 in January 2001, which still constitutes SGA.

-22-

determination that Plaintiff had been working for more than 6 months at SGA levels was supported by substantial evidence. Consequently, Plaintiff's past work as a records clerk could not constitute an unsuccessful work attempt.

Even assuming that the ALJ erred at step four in determining that Plaintiff could perform her past work as a records clerk as it is generally performed, the ALJ's ultimate non-disability finding would nevertheless be supported by substantial evidence. The ALJ did not stop her inquiry at step four. Rather, she proceeded to step five and determined that a significant number of jobs existed in the national economy for an individual of Plaintiff's age, education, work history, and RFC based upon the VE's testimony. When an ALJ poses a hypothetical question to a VE that fully and accurately incorporates a claimant's physical and mental limitations, and the VE testifies that a person with such limitations is capable of performing a significant number of jobs in the national economy, such testimony is sufficient to support a finding that the claimant is not disabled. *Varley*, 820 F.2d at 779. As noted above, the ALJ's RFC finding was supported by substantial evidence. The ALJ incorporated that RFC into her hypothetical posited to the VE. The VE's testimony that Plaintiff could perform a significant number of jobs in the national economy in light of her RFC therefore constituted substantial evidence to support the ALJ's non-disability determination.

---

[7]     Defendant argues that even if the ALJ had determined that Plaintiff's past work as a records clerk were an unsuccessful work attempt at step one, such a finding would not have precluded the ALJ from finding that the same work qualified as past, relevant work at step four. *See, e.g. Faison v. Barnhart*, 301 F. Supp. 2d 1330, 1332-33 (M.D. Fl. 2004). Plaintiff asserts that an unsuccessful work attempt is not SGA under 20 C.F.R. § 404.1574(c). Thus, because past work is only relevant if it was SGA, *see* 20 C.F.R. § 404.1565(a), an unsuccessful work attempt is not properly considered to be past, relevant work. *See Carreno v. Comm'r of Soc. Sec.*, 2004 WL 1050853 * 1-2 (6th Cir. 2004) (implicitly finding that an unsuccessful work attempt is not past, relevant work). Because the ALJ determined that Plaintiff's work as a records clerk was not an unsuccessful work attempt, it is not necessary for this Court to resolve this debate.

-23-

## V.   RECOMMENDATION

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 16) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 10) should be **DENIED** and her Complaint **DISMISSED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 9, 2007                    s/ Mona K. Majzoub
                                           **MONA K. MAJZOUB**
                                           **UNITED STATES MAGISTRATE JUDGE**

### PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 9, 2007                    s/ Lisa C. Bartlett
                                           **Courtroom Deputy**